Thank you, your honor. May it please the court. Counsel. Casey Murray with Amy Lewandowski on behalf of City of Sedalia, EBA Bothell Regional Medical Center. We're in a fortuitous situation here. Often times when I'm arguing to follow precedent, I'm looking back five, ten years ago, different circuits, different areas, but in this case, this court, the 8th Circuit, issued a decision this May, the Hottman v. Union Pacific Railroad, that addressed a key dispositive issue in that case and reached a decision that we believe, the appellant said that the Hottman case was correctly decided. The legal framework, the legal foundation of that case compels the reversal of the district court's opinion in this case. The appellee's argument implicitly assumes that Hottman was wrongly decided. They make attempts to distinguish the Hottman case from this particular case on the facts and I guess I'd say the district court pretty clearly disagreed with his colleague's decision in Hottman That is correct The district court, which was not controlling That is correct And opposing counsel briefed the case accordingly, but Hottman and the 8th Circuit is controlling Right So it doesn't matter that the district court thinks Hottman and the district court was wrong Right. That is correct. In fact, if I don't criticize the appellee's brief for not anticipating that Hottman, 8th Circuit is controlling and you better distinguish it Of course. And the timing of when Hottman came out in the briefing obviously affected the parties in this case. Having the benefit of the 8th Circuit's analysis of this benefits and privileges issue was obviously extremely helpful in this case. We, as appellants, did not have that, the privilege of having that opinion in front of us at the time of the appellant's brief. We did, in our reply brief, were able to address it pretty directly and go into great detail about why the legal foundation supporting Hottman applies just as equally in this case. As this court is well aware, under the ADA, in order to have a failure to accommodate claim under the ADA, there needs to be an ADA accommodation request. And an ADA accommodation request must fall into one of three categories or three buckets, however you want to refer to it. A request for an accommodation to help apply for a position with an employer, that's not applicable here. The second bucket is allowing an employee to perform, an employee requesting accommodation to perform some essential function of their job. That also is not at issue in this case. That was an issue at the beginning of trial and during trial, but at the close of plaintiff's evidence and in response to a motion for directed verdict filed by the appellant, the plaintiff disavowed that argument, walked away from that argument, waived that argument and said, no, we're not moving forward with a claim that I need the service animal to perform the essential functions of the job. So that means the ADA request has to fall into the third bucket. Otherwise, it's not an ADA accommodation. And the third bucket is a request for an accommodation to enjoy the employer provided benefits and privileges of that employment. And of course, this makes sense conceptually. An employee may not need to access a cafeteria, for example, in order to perform the essential functions of their position. But that's still part of the job. The employee says, you know, everyone else can access the cafeteria. I too would like to access the cafeteria and I can ask for an accommodation which allowed me to do so. And that is this third bucket. And Counsel, on the one hand, that would seem to explain the attempted distinction between a seeing eye dog on the one hand and the diabetic dog on the other hand. And yet, what about cases where we would have to provide accommodation for a diabetic to do blood testing or something? How is that really different here, given that they're arguing that they need this to maintain their health? I would argue a few things. First, to be clear, the blood testing, allowing for the blood testing and allowing for food at the workplace, that was an accommodation that was provided by the employer in this case. But for that specific example you've asked, I would argue that allowing an employee to blood test and to do things like that to manage, that could be, that would be for an essential function of the job. In order to do my job without becoming dizzy and passing out, I need that in order to do my job on a day-to-day basis. And plaintiff here could have argued that I need my service animal in order to allow me to do my job on a day-to-day basis, but chose not to fit their claim into that bucket. And instead, the argument that appeared to be accepted by the district court is that this third bucket is more of a catch-all. It's, well, if it's not in the first two, it's general employability. And the benefits and privileges refers to general employability, so if it's not in the first two, it falls in the third bucket, and that's how we need to analyze this. And we believe the decision in Hottman, which relied extensively on the EEOC's interpretive guidance, which again is generally found to be controlling and less clearly erroneous, but that found very clearly, well, the benefits and privileges doesn't mean general employability. It's not a catch-all. It is a very specific meaning. It is employer-provided benefits and privileges. It's facilities and activities that the employer provides to the, to its employees that they, the employee can otherwise not access. And I think one of the reasons this case gets so convoluted, and we ended up here, is because the point of fear kind of turned the ADA on its head in a way. Normally, the ADA is designed to remove barriers. Let me jump ahead and take the case where you're understandably taking. I'm sure we're wrong, but probably that it doesn't apply. And so my question is, and I'm, I'm looking at Addendum 28, Ms. Howard's response to what is, was basically a benefits and, and privileges question. Can you tell, you know, what, what, are there ways that you feel like having Corey at work would allow you to enjoy the same benefits as other employees? Yes. Can you tell me about that? I imagine that other employees have the ability to manage their conditions however they see fit. And with Corey being there, I'm able to do the same thing, manage my diabetes. Now, that's not unlike the blood test. And so my question is, if Hopman applies to this, do we grant JAML or do we remand for a new trial, for a, for further proceedings at which Ms. Howard would have the option of raising an essential functions claim that she is thus far disavowed, or counsel have disavowed. And she, what she thinks is legitimate. I would, I would say that, I would suggest that, the appellant suggests that this case should be reversed. And you should, and over, and grant the JNOV to the question about plaintiff's testimony on the benefits and privileges. But this is, this is, this is supervening controlling law, which changes the playing field. And, and so we're supposed to anticipate that if the, if the counsel on both sides had had, and the district court, had had the benefit of this controlling law, they would have done the same thing? I think clearly no. And, and why, why shouldn't Ms. Howard and her attorneys have an opportunity to reconsider that and decide whether to seek to amend, however they would put in issue this essential functions question? I, I would argue that the benefits and privilege question was discussed, argued, and preserved, and. Without knowing the law. They, they had the benefit of the EOC interpretive guidance, which not only in this most recent decision. Which the district court rejected. The district court rejected that, but we suggested that was an error because that should be, that is generally controlling and less clearly erroneous. And, and we discussed, we presented a jury instruction as part of the verdict, or part of one of the jury instruction 20, I believe, had a reference to the benefits and privilege. In fact, we quibbed the jury instruction directly from the Hoffman jury instruction. This was an issue that both parties were well aware of during trial. And plaintiff made a choice that we're going to move forward on benefits and privileges, believing that testimony of, well, of Ms. Howard's imagination of what Bothell provides to other employees was sufficient. And we argued at, at the time, and again now, that, that Ms. Howard's imagination of what Bothell may or may not provide to other employees on its own still doesn't mean that it doesn't. But, but they had no circuit court which adopt, which adopted their, their view. Or the opposite view. This was, this was a blank, this was a, this was a blank slate in the circuits. A lot of, a lot of district courts had messed around with it, and that's surprising. You can almost guess the circuits in which the, the conflicting views had emerged. But they were conflicting, inconsistent. The reasoning was not very persuasive. That is correct. This, this is, appears to be an underdeveloped area of the law. As Judge Loken, you noted in the Hotman decision, that, that, that this is not, there is not a lot in there on this very narrow topic. And if the court would prefer to remand to, to retrial on that issue, of course, you're welcome to, but we would, we would suggest. I know, I understand. Okay. We would like to quickly address the district court's attempt to distinguish the Hotman decision from the lower court from our case, from the particular case. And while the district court said it wasn't controlling, the district court also focused on the fact that, well, Mr. Hotman needed the, needed the service animal for his PTSD, whereas Ms. Howard had provided testimony that she needed it for her diabetes care that had potentially life-threatening consequences, if not met. We believe this is a fact distinction between the, these two requests for accommodation that are, it's a distinction without difference with regard to the buckets. That the, how much an employee may or may not need an accommodation doesn't apply in the analysis of whether or not it fits in one of the three buckets of an ADA accommodation. The need for the accommodation is addressed during the interactive process. And that's, that's the portion where the employee and employer work together to find some sort of accommodation that removes the barrier of employment. And in this case, there has been no barrier to employment that's been identified. Ms. Howard cannot identify anything she could not do. In particular, she must identify some employer-provided benefit and privilege that she can't access, and she has been completely unable to do so. And in that case, we believe she fails the Hotman test, and as such, it was, the court was in error in failing to grant the JNOV. Because when there was no evidence presented for an element, the JNOV should be proper even at the face of a jury verdict. And in fact, my final 30 seconds before I'll try to save some time to rebut. That was, you know, this was a direct argument in front of the district court. We, we, we presented the, the Hotman argument to him, and he specifically again, he was under no obligation to, to agree with us, but had he had the benefit of this court's decision, we believe he would have made a different decision. And if there's no questions this time, I'll save my last two minutes for rebuttal. Thank you. Ms. Johnson. May it please the court. I think Judge Loken touched on the biggest issue that we encountered in this case. And that's that this idea of the management of a chronic disease such as diabetes. Where it fits within even the blood, the blood testing that one may need to do to maintain the health of their health long term and short term. Where does that fit? Because they can do their job, but they still need an accommodation to be able to manage a condition that it can be acutely life threatening, as well as chronically problematic for a patient. And so we were at trial looking at a lot of different precedent about what these three buckets were for. And while we had some decisions that said one thing, we had other decisions that said another. You don't have to explain that. I mean, it looks good to me because I went through it in Oppmann. Right. Yes, the law was a dilemma. And I think the EEOC guidance and other help was quite probative. And should have been, should have driven the train, but didn't. And didn't in Oppmann either. You know, I think when we look at the two buckets, it's interesting when we look at the reply brief that was filed. Contrary to the position taken at trial with respect to whether or not Ms. Howard needed the accommodation in order to do the essential functions of her job. The appellee's brief says, the reply discusses that she needs to do this. In your view, did you waive it? No, your honor, I did not waive it. We, there was an acknowledgement during the direct verdict argument that the judge was looking at this as an equal benefits and privileges case and not as an essential functions case. We did submit a jury instruction on that point on both the essential functions as well as the equal benefits and privileges of employment. Precisely because we didn't understand which bucket, or it was unclear which bucket it fell into. And so we were doing our best to follow the spirit of the law. I think it's clear that an accommodation to monitor one's blood sugar is something that should fit somewhere. And the question is, where does it fit? And Hoffman provides us with some great guidance on that, where it fits, that we did not have the benefit of at the time of trial. You know, in reading in isolation what was said at the close of evidence and comparing what takes place then with the instructions conference and the instructions, there's some divergence, right? Because if you look at what's said at the close of evidence, it sounds like, well, we're abandoning that. And yet, these still ask for the instructions, so that has to be some indication that it wasn't a complete abandonment. It certainly wasn't my intention to. It was an acknowledgment of the discussion we were having on the record with the court that we were comfortable proceeding on the other item. And that if the court was going to rule as it seemed that the court was going to rule, then let's move forward on that. But I certainly did not intend to abandon that point. I, you know, perhaps used the wrong verbiage, but we did maintain that point, you know, through the jury instruction process, and made our effort to understanding that the law itself is difficult. And I acknowledge, you know, there's language from the interpretive guidance that could go one way, and there's language from the interpretive guidance, respectfully, that you could argue the other way. And so we would appreciate, you know, I think we could distinguish Hoffman. And we've made an effort to do that in the briefing, which- Well, I didn't see much of an effort. Well, you know, I think you need, this is the difference. I didn't see a careful argument that a seeing eye dog on a highly, on a hazardous freight train engine room is somehow materially different than a service dog in a health care sensitive area of a hospital. It seems to me the two, they don't fit like a glove, but they certainly seem sufficiently comparable that Hoffman applies. So I understand your point. What I would say is that particular question with respect to what the service animal poses to an environment is actually a different question than we're talking about now. That goes to the question of direct threat. I thought that was the question we should be talking about. I'm sorry. Well, I mean- I don't understand the question you're talking about. So there are different elements with respect to the ADA claim. You have initially, is this an accommodation that allows you to enjoy the equal benefits and privileges of employment? And that is the question on appeal. And so what we're looking at there is what does the service dog- And so Hoffman seems to say no. Then you say, I can distinguish Hoffman. And the only way I can think of, you say, well, I'm not arguing that. I'm arguing something else. I don't understand what distinction you're attempting. There's nothing in your reply brief that's a meaningful distinction. What are you offering? Right. That's what I'm trying to kind of go through. Is that with respect to a service animal, we can't treat every service animal the same. Every service animal serves- Different categories of service animals serve different functions. All right. So the service animal is different than a seeing eye dog. And so it serves a different function. And therefore, it's distinguishable from Hoffman. I think, first of all, I don't believe Hoffman was a seeing eye dog. My recollection of it was that it is an animal to address conditions with PTSD and oncoming migraines. That's true. Yeah. And, you know, but anyhow, different disease, different animal, different case. Right? That's kind of your claim. Yes. Right? Now, and I assume that you're going to argue from that point of view, that we ought to affirm across the board at this point, right? And I just have some questions about the evidence, about the reasonableness of the accommodation request here. Because if you look at the evidence of the request here, I see where the person who prescribed this dog is not an endocrinologist, has no specialized training in the use of animals of this sort, has no expert background. So it's a lay opinion. That's all it is. And the lay opinion says, I believe that you ought to have this dog. Now, the lay opinion stands, you know, with as- You know, you could maybe get that in. But there's not much weight to it. And then there's nothing that's offered. Like, you know, in dog cases generally, when you see dog cases, somebody offers in a whole mess of evidence that says, my dog is trained A, B, C, and D. My dog has been tested to do A, B, C, and D. My dog accomplishes A, B, C, and D on a regular basis. My dog is better than the alternatives. Therefore, dog is a reasonable accommodation. And that evidence is never really presented here, right? I mean, there's just the presumption that the dog is trained, the dog is a service animal, it can do these things. But there's no expert testimony that says that. I mean, I keep looking at it in the context of just across the board, civil cases, criminal cases. I mean, in the grand bell curve of how dogs perform, some dogs are lousy, some dogs are good, right? And if we look at drug dogs, there are dogs that fail to be qualified as expert drug-sniffing dogs, right? Because they're not reliable. And none of that evidence is here. And so the question is, does that matter? Do you think that evidence needs to be in the record for you to prevail? Or is this record good enough? I believe the record is sufficient, Your Honor. Okay, and why? Because, well, first of all, with respect to Dr. Delaney's testimony, I would respectfully disagree that it doesn't qualify as expert testimony.  So you haven't followed the rule. Well, he's noticed as a- As a treating physician. As a treating physician who prescribed the accommodation. Right, but there's nothing in the record that says he's got any training on dogs, or there's even any specialized training in endocrinology. Well, the record actually, if you look at Dr. Delaney- He says he has a kid, and he has studied this because he has a child, and he's a widely opinion about the efficacy of these service animals because he has a child who has juvenile onset diabetes. He also testified, Your Honor, that he's done extensive research on diabetic service animals. He's looked into it quite a bit because his patient base is highly concentrated in diabetic patients. And that it was his opinion that this is an effective manner in which Samantha Howard can manage her chronic condition. And then we had Ms. Howard's testimony about her personal experience with the animal, as well as admissions from opposing counsel, or I'm sorry, the opposing expert, that these service animals can in fact be so trained. And so I think, while I understand your position, the threshold inquiry has been met. And then that question goes to the jury. And the jury was presented with a question of reasonableness, including questions related to whether or not it was reasonable in light of the availability of CGMs, continuous glucose monitors. And the jury answered in the affirmative that it was reasonable. And so, respectfully, I don't know that that's the precise issue on appeal. The question is, do we have enough evidence to meet that threshold? And I think that with Dr. Delaney, the studies that were presented by the defense's own expert and Ms. Howard's testimony, that we meet that threshold. And then the question is one for the fact finder. Is it reasonable? And the fact finder heard from Samantha regarding her personal experience with CGMs, the reasons that she had elected to engage in the search for a service animal. We heard from Dr. Delaney about reports from his patients that there are some patients that have issues with these. You see, to me, this is a much more realistic argument if it's in terms of an essential functions claim. And again, your Honor, I don't know. Dr. Delaney just said, well, this would be nice. She needs this to get along, to manage her diabetes, which she has to do at home as well. Now, if it's an essential functions claim, this thing gets much more focused along the lines Judge Erickson is asking about. And we don't have that. And you didn't put it in because you chose not to use that bucket because it's harder to fill. I respectfully disagree that I chose not to use that bucket. But with respect, I did submit a jury's instruction on essential functions. It got you to let you go to the easy bucket. My understanding is that it's not an easy bucket if you really focus on the employer has to provide the benefit or privilege for it to be in that bucket at all. Well, I would say that like the appellant's argument with respect to the that's indicated in the reply, you know, Ms. Howard needs to be alive to do the essential functions of her job. Ms. Howard also needs to be alive and conscious to go to the cafeteria. I mean, where you put it, the problem is that the law before Hoffman was not incredibly clear on what that third prong meant. And so we were faced with trials. What the EOC guidance was, it's just a lot of courts on one coast or the other didn't like it, so they didn't follow it. Well, I would even point to the Western District of Arkansas that decided that case. And you see a flip-flop even in the Western District of Arkansas. Prior to the trial in that case, the Western District of Arkansas came down, and as we were working through this case, came down with a very different decision on summary judgment than it ultimately determined to be what the rule recognized when it made the decision on the judgment notwithstanding the verdict. So, I mean... So what is the benefit and privilege that you feel was proved here? That she... I believe that you have to... Well, at its most simple, at its most simple, it is the ability to be conscious and alive and healthy. And you need to do that in order to be able to go to the company picnic. You need that to be able to go to the cafeteria. It is as much in line with that analysis as it is in line with an essential function analysis. You need this to be conscious while you do your job. You need this to be alive when you are doing your work. The same kind of analysis would apply if you're going to use that. My position is that this particular type of accommodation for something like monitoring blood sugar doesn't fit in a clear bucket. And so what we were doing at trial is trying to identify the bucket that it fit into without an incredibly great consensus in the law about which bucket would apply. And I think that the West... If you look at the Western District of Arkansas' decision before trial and the decision after trial, that difference in that... The issue with the clarity of the law on that point is clear. And so I think you have to look at it in that context. What did you mean by that? The clarity of the court's point is clear. I mean that the clarity... What case are you talking about now? The Hotman case. If you look at the underlying Hotman case, it's not your decision, Your Honor. But the Western District of Arkansas made a decision on summary judgment in that case that I believe highlights the differences and the problems with the state of the law and our ability to properly plead and prove our case. If you look at then its decision after trial. Because if you look at those two decisions and look at that, I think what I'm saying is that it highlights the difference. Were they both before our Hotman or was it after trial? They were both in the same case. In summary judgment, the decision and rationale... The timing. Which one did the district court reject? I'm not... I'm sorry, I don't quite... So initially the district... The district court refused to follow Hotman in the district court. I'm sorry? The district court here refused to follow Hotman in the district court. Didn't... This... Yes. Okay, which Hotman that you're talking about? Hotman 1 and Hotman 2. Which one? I'm just saying that the differences between... Answer the question. I'm trying to, Your Honor. The differences between the two cases, my point was... Which one came when? Which one came when? The summary judgment decision came before the decision on the judgment not withstanding the verdict. Which one was... Which one was argued as persuasive precedent and rejected by the district court here? The second one. All right, so the... So what the hell is the relevance? Excuse me, but what's the relevance of the first one? My point was, Your Honor, that I think that the difference between those decisions highlights the state of the law at the time we were arguing and presenting this case. Yeah. And that's all my time. I get that that's what the claim is, is this is a moving target. It was hard to know. And we didn't know where we were supposed to be. And I assume that your response is, you know, we should... This case should be affirmed. But even if it's not affirmed, we certainly deserve a right to retry it with all issues still preserved. Absolutely, Your Honor. Okay. Thank you. Thank you. Rebuttal. Counsel, there was some discussion about the court's ability to remand for retrial here. I'm wondering what relevance, if any, to that analysis... What relevance is it that Ms... I'm sorry, your name? Howard. ...resigned during the interactive process? Well, I believe that's a key fact that's been developed in this case is the fact that she, Ms. Howard, is the one who ended the interactive process rather than what Bothwell did. And we've argued extensively on other points. We've been focusing on the Hoffman point today. But obviously, on one of our other points was what is a standard, what is a legal standard a district court and appellate court should look at when analyzing who is at fault for the breakdown of the interactive process in an ADA discussion. And we believe the case law is very clear. It needs to be an objective standard. You look at what the employer did, what the employee does, not the subjective motives behind those decisions. It's practically unworkable for an employer because an employer is not one person. Usually, it's a number of people. And finding one person who's skeptical of a proposed accommodation, that's irrelevant in our opinion. We look at what did the employer do. Bothwell here provided paid leave throughout the period. As soon as the service animal arrived and Ms. Howard could no longer, was no longer able to be in the pharmacy, she was on paid leave the entire time until she quit. And paid leave has been found to be a reasonable accommodation in many other cases. We cited a number of them. Barnes vs. Ford Motor Company was one that's very analogous. They offered another job, which in certain circumstances can be a reasonable accommodation. They offered other accommodations. But most importantly, I think the telling fact of, the objective fact of who is acting good or bad faith or who is at fault for the breakdown is the fact that after Ms. Howard quit and Bothwell said, wait, wait, please don't quit. Let's have a third party expert make this decision. We don't know if it's safe to have the service animal in the pharmacy. Let's let a third party decide. Ms. Howard still said, no, I don't want to do it anymore. I had a few other points that I'd like to address, but I'm out of time. So if there's no further questions. No, the case has been fairly brief, effectively argued, argument helpful. Thank you, Your Honor. We'll take it under advisement.